**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>        **Plaintiff,**<br><br>                  **v.**<br><br>**DUSTIN XAVIER WILKINS,**<br>        **Defendant.** | **Criminal Action No. 13-267 (JDB)** |

## MEMORANDUM OPINION

On June 20, 2014, Dustin Xavier Wilkins pleaded guilty to a wire fraud scheme in which he conned luxury hotels and other service providers out of more than $100,000.  He was sentenced to 33 months of imprisonment and three years of supervised release.  He now brings this petition for habeas corpus relief under 28 U.S.C. § 2255 alleging that his attorneys during both the plea deal stage and the sentencing stage provided him with ineffective assistance of counsel in violation of his Sixth Amendment rights.  He seeks to withdraw his guilty plea and instead be tried before a jury, or at the very least, receive a new sentencing hearing.  After holding a two-day evidentiary hearing, receiving over 75 exhibits, and reviewing extensive pre- and post-hearing briefing from both sides, the Court will deny Wilkins' petition.

## BACKGROUND

Prior to his incarceration, Wilkins was an aspiring singer and performer.  In an effort to advance his career in the entertainment industry, Wilkins tried to live the celebrity lifestyle.  This included staying at expensive hotels, dining in high-end restaurants, riding in limousines, and consuming other luxury goods and services.  Wilkins ran into trouble, however, when he paid for these luxury services through a fraudulent debit card scheme.  Although Wilkins now disputes some of the specific alleged instances of fraud, or the dollar amounts attached to his fraud, he does

not dispute that he committed many of the acts to which he pleaded guilty. The following account is based on the Statement of Offense (to which he agreed) and his testimony in Court during this habeas corpus proceeding.

Wilkins used a similar modus operandi to defraud a wide range of merchants. He would book a hotel room (for example) in his own name or using an alias, and sometimes represent himself as a VIP affiliated with a well-known record company or celebrity in order to receive corporate rates or special treatment. <u>See</u> Statement of Offense [ECF No. 16] ¶¶ 8, 11. He would then present a pre-paid debit card for payment, which he knew was out of funds. <u>Id.</u> ¶ 12. Later, he would call the merchant purporting to represent the bank or debit-card company, sometimes disguising his voice, and provide fraudulent authorization codes that would allow the transaction to proceed, despite the lack of funds. <u>Id.</u> Only later, when the bank or debit card company reconciled its books, would it notice the unauthorized charge, and "charge back" (that is, recoup) the funds from the vendor. <u>Id.</u> The vendor would then face a loss for the services that Wilkins received.

Wilkins carried out this scheme at multiple hotels in the D.C. region. <u>See</u> <u>id.</u> ¶¶ 13–24. For example, in January 2009 Wilkins made a reservation at the Hotel Palomar in D.C. for the weekend of the presidential inauguration. <u>Id.</u> ¶ 19. After he checked in, he made multiple purchases that were charged to his hotel room, including dining out, room service, parking, dry cleaning, movie rentals, and a limousine service. <u>Id.</u> ¶ 21. By the time he checked out, his bill totaled $12,890.67. <u>Id.</u> ¶ 22. He "paid" his bill with a pre-paid debit card using a fraudulent authorization code. <u>Id.</u> Although the charge initially went through (thanks to the fraudulent authorization code), the debit card company ultimately reversed the transaction when it discovered that the card did not have sufficient funds. <u>Id.</u> ¶¶ 22–23. The hotel was then out of pocket the full

$12,890.67.  Id.; see also Def.'s Exs. 63 & 69 (business records from the Hotel Palomar documenting unpaid bill).

In September 2013, Wilkins was indicted on one count of conspiracy to commit wire fraud under 18 U.S.C. §§ 1349 and 1343, eight counts of wire fraud under § 1343, two counts of access device fraud under 18 U.S.C. § 1029(a)(2), and three counts of fraud under 22 D.C. Code §§ 3221(a) and 3222(a)(1).  See Indictment [ECF No. 1].  The indictment also included criminal forfeiture allegations seeking a money judgment against Wilkins in the amount of $35,615.73.  Id. ¶ 33.

In June 2014, Wilkins pleaded guilty to Count Two, wire fraud in violation of 18 U.S.C. § 1343.  See Plea Agreement [ECF No. 15] at 1.  The agreed-upon loss amount was $106,668.29. Id. at 9.  According to the sentencing guidelines, the offense level for this crime is determined by the loss amount and the number of victims.  Thus, in the plea agreement, the parties agreed that Wilkins' estimated adjusted offense level was 17, due to a base offense level of 7, plus 8 levels for a loss amount greater than $70,000, plus 2 for an offense involving 10 or more victims.  See Plea Agreement at 3; U.S.S.G. §§ 2B1.1(a) (base offense level); 2B1.1(b)(1)(E) (loss amount greater than $70,000); 2B.1(b)(2)(A) (10 or more victims)[1].  The total offense level was then reduced by 3 levels for acceptance of responsibility.  See Plea Agreement at 3.  The plea agreement also estimated that Wilkins had 12 criminal history points and therefore was in a criminal history category of V.  Id.  This was based on his prior criminal convictions, including a conviction in 2010 for credit card fraud in Henrico County, Virginia.  See id.  His applicable guidelines range based on an offense level of 14 and a criminal history category of V was 33–41 months.  Id. at 4.

---

[1] A court is to use the sentencing guidelines manual in effect at the time of sentencing, except where doing so would present an Ex Post Facto clause concern.  See 18 U.S.C. § 3553(a)(4)(A)(ii); Peugh v. United States, 133 S. Ct. 2072, 2081 (2013).  The 2014 guidelines manual was in effect at the time of sentencing, and was used.  All citations are to the 2014 manual unless otherwise noted.

During the time of his plea agreement, he was represented by attorney Anthony Miles of the Federal Public Defender's office.

After his plea agreement, Wilkins became dissatisfied with Miles as his attorney. Although there is conflicting testimony about the extent to which Wilkins communicated with Miles about his unhappiness with the plea agreement, there is no dispute that Miles withdrew as Wilkins' attorney in June 2015, approximately a year after the plea. See June 10, 2015, Minute Order. Attorney Mark Carroll then entered an appearance as Wilkins' attorney. See Not. of Appearance [ECF No. 33].

 In September 2015 Wilkins was sentenced to 33 months' imprisonment to be followed by three years of supervised release. See Sept. 16, 2015, Judgment [ECF No. 46] at 2–3. Immediately afterward, he filed an appeal. See Not. of Appeal [ECF No. 44]. Wilkins then apparently fired Carroll as his attorney, and filed a pro se motion to withdraw his guilty plea, claiming ineffective assistance by both of his former attorneys, Miles and Carroll. See Mot. to Withdraw Guilty Plea [ECF Nos. 49 & 50]. Wilkins obtained new representation, attorney Edward Sussman, who re-filed Wilkins' motion to withdraw his guilty plea styled as a petition for habeas corpus relief. See Petition for Habeas Corpus [ECF No. 66]. Wilkins also voluntarily dismissed his appeal. See Order, Dec. 10, 2015 (No. 15-3058) (D.C. Cir. 2015) (unpublished) [ECF No. 67]. Wilkins was, at that point, displeased with Sussman and hired another attorney, Bernard Grimm, but shortly after, he elected to continue his representation pro se. Ultimately, however, Wilkins obtained by court appointment a new attorney—Gregory Smith—who now represents him in this matter. See Not. of Appearance [ECF No. 87].

In Wilkins' petition, he alleges that he received ineffective assistance of counsel from both Miles and Carroll. He contends that they provided ineffective assistance at three different stages.

First, Wilkins argues that at the plea agreement stage, Miles failed to properly investigate all of the misconduct to which Wilkins pleaded guilty. Second, Wilkins argues that after the plea agreement, both Miles and Carroll failed to move to withdraw Wilkins' guilty plea despite his requests to do so. And third, Wilkins argues that at the sentencing stage, Carroll failed to raise several arguments that could have reduced his sentence.

The Court received and considered extensive briefing from Wilkins and the government. The Court held a two-day evidentiary hearing on November 28 and 29, 2016, where it heard testimony from Wilkins, Miles, and Carroll, and received over 75 exhibits. The testimony included evidence regarding whether Wilkins was responsible for all of the losses detailed in the Statement of Offense, to what extent Miles investigated those offenses, and the communications between Wilkins and his attorneys. The Court also received and considered post-trial briefs from both parties, as well as the transcript of the evidentiary hearing.

## LEGAL STANDARD

When a petitioner seeks habeas corpus relief from a sentence imposed by a federal court, if the court finds that there has been "such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). Here, Wilkins alleges that his Sixth Amendment right to effective assistance of counsel was violated by the ineffective assistance that he received from his attorneys.

"The Sixth Amendment right to counsel 'is the right to the effective assistance of counsel.'" Buck v. Davis, 137 S. Ct. 759, 775 (2017) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)). To succeed on an ineffective assistance of counsel claim, Wilkins bears the burden of

showing first "that counsel's performance was deficient" and second "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "The two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985).

As to the first prong, counsel's assistance was deficient if it "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. This prong "sets a high bar." Buck, 137 S. Ct. at 775. "Judicial scrutiny of counsel's performance must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Strickland, 466 U.S. at 689. Thus, "[it] is only when the lawyer's errors were 'so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment' that Strickland's first prong is satisfied." Buck, 137 S. Ct. at 775 (some internal quotation marks omitted) (quoting Strickland, 466 U.S. at 687).

As to the second prong, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

## ANALYSIS

Wilkins alleges that his two attorneys failed him at three separate points in time: at the guilty plea stage, after his guilty plea when he allegedly asked counsel to withdraw his plea, and at the sentencing stage. The Court considers each in turn.

### I. The Guilty Plea

Wilkins alleges that Miles failed to perform an adequate investigation into whether or not Wilkins committed all of the acts listed in the Statement of Offense in the proposed plea agreement, and therefore that Miles' advice regarding the plea was ineffective. An attorney's "strategic

choices made after thorough investigation of law and facts . . . are virtually unchallengeable." Id. at 690; see also United States v. Catlett, 97 F.3d 565, 570 (D.C. Cir. 1996) (applying the same test). Conversely, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91. "In other words," the Supreme Court explains, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. Thus, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. The D.C. Circuit has described this standard as "whether [the] attorney's less-than-thorough pre-trial investigation was supported by 'reasonable professional judgments.'" United States v. Mohammed, 693 F.3d 192, 203 (D.C. Cir. 2012) (quoting Strickland, 466 U.S. at 691).

At the plea agreement stage, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. As the Supreme Court has explained, "the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." Id. Thus, "[t]his assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." Id. (internal citation omitted). Both the length of the potential sentence following conviction as compared to the plea agreement, and the strength of the government's evidence, are relevant to this analysis. See United States v. McCoy, 215 F.3d 102, 108 (D.C. Cir. 2000); see also United States v. Zaitar, 641 F. App'x 1, 1–2 (D.C. Cir. 2015); United

States v. Wright, 429 F. App'x 4, 5 (D.C. Cir. 2011). In determining whether there is a reasonable probability that the defendant would have gone to trial, a court considers "not only the count to which the defendant pled guilty, but also the other counts he would have faced had he gone to trial." In re Sealed Case, 488 F.3d 1011, 1017 (D.C. Cir. 2007)

Based on the testimony and exhibits presented during the evidentiary hearing, the Court finds that nearly all aspects of Miles's performance at the plea agreement stage did not "f[a]ll below an objective standard of reasonableness." See Strickland, 466 U.S. at 688. Rather, his admittedly less-than-thorough investigation was not unreasonable given "all the circumstances," and his subsequent strategic choice to recommend that Wilkins agree to the proposed plea agreement was likewise not unreasonable. See id. at 691; see also Mohammed, 693 F.3d at 203.

The Court does find that Miles' failure to consider whether the statute of limitations was a viable affirmative defense was objectively unreasonable performance. However, that performance did not cause Wilkins any prejudice.

Wilkins alleges that Miles conducted no investigation into the illegal acts that were outlined in the Statement of Offense, including into the loss amounts and the number of victims. See Def.'s Pre-Hearing Br. [ECF No. 104] at 6, 10. During the evidentiary hearing, Wilkins elaborated on which acts in the Statement of Offense he now claims he did not commit, and described how he believes Miles failed to investigate those offenses. He testified that he believes several of the offenses were committed by copycats who knew his name and had personal disagreements with him, and therefore had motive to harm his reputation by running up fraudulent charges at hotels and similar merchants. See Nov. 28–29, 2016, Hr'g Tr. 14:4–15:21 [ECF Nos. 122 & 123] (hereinafter "Tr."). He further stated that Miles "never sat there and went through the indictment with me" and did not go through each of the alleged victims "one by one." Tr. 27:3–5, 11–15.

8

Wilkins contended that Miles discussed fewer than 10 of the alleged criminal acts with Wilkins. Tr. 27:14–15. Wilkins also asserted that Miles never went through discovery that Miles received from the government with him. Tr. 44:8–10. But then he later clarified that Miles did go through a few documents for several of the victims, but not the full discovery. Tr. 47:4–48:10. He also testified that he asked Miles to investigate all of the alleged conduct and "wanted [Miles] to investigate the accusations" because Wilkins' past experience with the criminal justice system taught him that "you investigate or ask questions or have the prosecutor to ask questions to their witnesses and make sure with certainty." Tr. 27:17–24. Wilkins said that, in response, Miles "called [him] a liar" and claimed that Wilkins had "a long history of doing this." Tr. 28:7–8. Wilkins asserted that Miles in fact "never investigated any of the victims." Tr. 48:22.

Wilkins then identified several instances of fraud recited in the Statement of Offense that, he contends, had Miles investigated, Miles would have found could not be proven. Wilkins identified the Aloft Hotel in Maryland, which the Statement of Offense lists as having been defrauded of $1,581.40 during a stay from April 16 through April 20, 2010. See Statement of Offense at 7. But Wilkins tendered evidence—that the government and Miles did not dispute— that he was incarcerated in Norfolk County, Virginia on the night of April 19, 2010. Tr. 32:4–5; Def.'s Ex. 6 (fax from Norfolk Sheriff's Office confirming Wilkins' incarceration overnight on April 19, 2010).

Wilkins also testified regarding the Hotel Palomar in Washington, D.C., which, according to the Statement of Offense, was defrauded of $ 12,890.67 for a stay from January 16 through January 21, 2009. See Statement of Offense at 7. Wilkins testified that although he did defraud that hotel during that time, it was for a much lower amount, and he might not have stayed there for all of the nights listed. Tr. 36:16–37:9. He stated that he asked Miles to try to identify and speak

with a former employee of that hotel who later told Wilkins that the hotel itself engaged in a fraudulent scheme that it tried to pin on Wilkins. Tr. 37:10–15; 38:8–25. Wilkins asserted that Miles never spoke to that employee, and that Miles tried to dodge that employee's calls and then lied to Wilkins about doing so. Tr. 40:9–10; 40:16–42:17.

For several other acts listed in the Statement of Offense, Wilkins testified that he did defraud the victim, but not for the full amounts listed. For example, Wilkins testified that he does remember the St. Regis Hotel, but it is unlikely that he stayed at that hotel during the listed dates (October 10 through 19, 2008) because he is usually at his mother's house in Virginia for her birthday on October 10. Tr. 209:9–20. He did, however, recall making a reservation there, but he did not, he claims, authorize the $12,958.40 in charges included in the Statement of Offense. Tr. 210:2–10. Likewise, with the Donovan House hotel—which the Statement of Offense lists as being defrauded of $5,172.16 from July 23 through August 3, 2008—Wilkins admitted to being there, but claimed he did not defraud the hotel of that amount. Tr. 206:17–23, 207:5–208:21. When reviewing the three documents purporting to demonstrate that his bill for that hotel stay was $5,172.16, Wilkins initially claimed that two of them were not his signature, then at the Court's prompting to be specific about which two documents, Wilkins spent several minutes in silence determining whether any of them bore his signature before ultimately stating that all three documents did not bear his signature. Tr. 208:11–21.

In addition to Miles' alleged failure to investigate, Wilkins also argued that Miles failed to fully explain the plea agreement to him. Wilkins testified that he did not have any time to discuss the final plea agreement with Miles before signing it, and that he only discussed it with Miles for ten to fifteen minutes, after signing it but before appearing in court. Tr. 57:18–58:18; see also Tr. 70:12–14 (Wilkins stating "[w]e didn't discuss any of these documents" in reference to the

Statement of Offense and plea agreement). Wilkins further claims that Miles told him the maximum sentence without a plea agreement would be 25 to 30 years; he later stated that Miles told him it could be "even more" although Miles "didn't go past 40 or 45." Tr. 61:1–2; 62:2–3.

Wilkins also argues that some of the acts listed in the Statement of Offense occurred outside of the statute of limitations. See Def.'s Pre-Hearing Br. at 11. He testified that Miles never discussed any statute of limitations defense with him. Tr. 64:14–16. This, Wilkins argues, is further evidence of Miles' inadequate representation.

During the hearing, Miles presented a different version of what transpired. Miles agreed with Wilkins' central point—that Miles himself performed little independent investigation—but describes this as a reasonable strategic choice based on the facts of the case. Miles testified that he received a "voluminous amount of discovery" from the government, "particularly documents." Tr. 298:19–20. He reviewed those documents, gave them to Wilkins, and then discussed some of the contents with Wilkins. Tr. 299:2–8. Although Miles did not go through all of the evidence with Wilkins, Miles knew that Wilkins had reviewed some of the documents because in later conversations Wilkins explicitly discussed certain documents—namely, the hotel bills—with Miles. Tr. 299:6–11, 16–22. Miles testified that, based on those documents, "it seemed clear to [him] that the evidence against [Wilkins] was overwhelming." Tr. 300:12–14. In forming this judgment, Miles relied on the extensive business records documenting the bills from hotels and other merchants in Wilkins' name and the statements from numerous hotel employees identifying Wilkins as the culprit. Tr. 300:12–301:1.

With respect to the charges that Wilkins now claims are suspect, Miles recounted that Wilkins did not raise most of these specific concerns with him at the time. For example, Miles testified that he discussed the charges from the Donovan House with Wilkins, and Wilkins

"ultimately said everything was true." Tr. 318:11–14; see also Tr. 368:1–20. Miles stated that Wilkins' story kept changing—while at times Wilkins denied staying at certain hotels or incurring certain charges, ultimately Wilkins agreed that he committed all of the acts in the Statement of Offense, with the one exception of the Hotel Aloft. Tr. 368:21–369:10, 370:11–372:10. Miles agreed that, other than the Hotel Aloft issue, the primary investigation that he performed was to review the evidence from discovery and discuss it with Wilkins. See Tr. 393:3–25. Miles did call one hotel to understand their billing procedures, but not to verify any specific charges with that hotel or any other merchant, or speak to any witness to confirm any witness statement. Tr. 390:15–391:20. Miles also spoke with one of Wilkins' past attorneys at Wilkins' request, who had represented him in a matter in Virginia. Tr. 393:17–23. Beyond this minimal leg work, after Wilkins conceded that he committed the acts described in the indictment and in the discovery materials, Miles did not perform any further investigation.

One issue that Miles did investigate, and that Miles recalled that Wilkins consistently contested, was the charges at the Hotel Aloft. Wilkins had told Miles that he was incarcerated during the time period when those charges were incurred. Tr. 406:4–6. Miles testified that his office investigated those claims, but determined that although the dates were close, they did not actually conflict. Tr. 406:7–15. Miles did not recall whether he determined that Wilkins was not incarcerated during any of the dates of that hotel stay (which is incorrect) or whether he determined that Wilkins could have made the reservation and incurred the charges even though he was incarcerated for part of that hotel stay (which is possible). See Tr. 406:10–407:11. Miles acknowledges that his office received a fax from the Norfolk Sheriff's office confirming that Wilkins was incarcerated from April 19 to 20, 2010, which includes one of the nights that he incurred charges at the Hotel Aloft. See Tr. 376:16–377:11; Def.'s Ex. 6 (fax).

Regarding the Hotel Palomar, Miles testified that he did not recall whether or not Wilkins specifically asked him to contact the former employee, but that Wilkins might have mentioned it. Tr. 395:3–12. Neither could Miles recall the set of phone calls between that employee, Miles, and Wilkins, that Wilkins alleged occurred. Tr. 391:23–392:9, 392:17–21. Miles does not deny that a phone call could have occurred, but said that a call with Wilkins and a witness would not be his normal practice—usually, an investigator would contact a witness directly. Tr. 392:17–21.

Miles' narrative of how the plea negotiations with the government proceeded, and of how Miles and Wilkins discussed the plea agreement, differs from Wilkins' testimony. Miles testified that he was aware that the Statement of Offense included more victims and a greater loss amount than the Indictment, and that he noticed that it included conduct that occurred more than five years prior to the plea agreement. Tr. 401:12–15, 402:24–403:4. Further, Miles stated that he attempted to negotiate a lower loss amount with the government, but that the government would not agree. Tr. 405:2–13. In terms of Miles' interactions with Wilkins, he testified that he read every word of the plea deal aloud to Wilkins, and that he discussed every part of the Statement of Offense with Wilkins. Tr. 395:13–396:5. Miles stated that he discussed the plea agreement with Wilkins at least a week before the plea hearing, although he could not recall exactly when. Tr. 396:17–20. Miles testified that he and Wilkins did not discuss any statute of limitations defense that could possibly be raised if Wilkins proceeded to trial. Tr. 403:25–404:2. However, he did discuss with Wilkins the fact that the government is permitted to include conduct in the Statement of Offense beyond what was listed in the Indictment, and that in his professional opinion based on the strength of the government's case, Miles believed Wilkins should accept the plea. See Tr. 403:5–9, 404:3–21. Miles also testified that he never advised Wilkins that he could receive 25 to 35 years if he were found guilty at trial; rather, Miles advised him that he could receive a higher sentence after a

trial than the agreed-upon guidelines range in the plea agreement. Tr. 449:13–450:10.

To the extent that Wilkins' and Miles' accounts diverge, the Court credits Miles' testimony and does not credit Wilkins'. Wilkins' testimony during the evidentiary hearing was rife with inconsistencies, and his manner and statements left the Court unable to consider him a credible witness. He frequently remembered certain information favorable to his case in great detail despite some events occurring several years ago, yet could not recall similar details that were unfavorable to his case. See, e.g., Tr.157:19–158:7 (Wilkins is sure he did not authorize more than one spa charge on December 9, 2007, but does not recall whether he stayed at that hotel at all); compare Tr. 160:2–8 (Wilkins specifically recalls that he used a cell phone rather than a room phone in a certain hotel in 2007) with Tr. 166:9–14 (Wilkins' entire recollection of whether he stayed at a certain hotel or whether anyone visited him at that hotel in 2007 is "vague"). His stories shifted under questioning from the government and the Court. See, e.g., Tr. 166:21–167:24 (Wilkins does not recall whether he stayed at the Hotel Monaco, but does object to a charge from that hotel's restaurant); Tr. 172:19–173:22 (providing inconsistent and incoherent answers as to whether anyone stayed with him or visited him at the Ritz Carlton).

On one memorable occasion, Wilkins first claimed that some signatures were not his, then when pressed to clarify which documents he was referring to, he spent several minutes in silence staring at the documents trying to decide how to answer. See Tr. 207:5–208:21. This left the Court with the impression that Wilkins was deciding which answer would be advantageous to his case, rather than examining the signatures to determine the truth. The content of Wilkins' testimony is no more believable. To hear his tale, numerous hotels throughout the city were all trying to defraud him in the same manner: by overstating the charges he incurred when staying there, or falsely increasing the duration of his stay. It is unclear whether Wilkins believes that

these hotels were acting in cahoots, or that multiple hotels (and some related service providers, like limousine or rental car companies) independently decided to defraud him. But both stories are equally implausible. Thus, the Court does not credit Wilkins' version of events

Conversely, the Court finds Miles' account of his investigation and his discussions to Wilkins to be generally credible. Miles fundamentally agreed with Wilkins' assertion that Miles did little independent investigation. His explanation that Wilkins at times admitted to the conduct in the indictment and Statement of Offense and at times did not is consistent with Wilkins' shifting testimony in Court. Although the Court does not accept everything that Miles recalled, the Court finds his testimony in essence to be credible.

Based on Miles' testimony and the parts of the evidence that are undisputed, the Court concludes that Miles' performance on all issues except the statute of limitations question was not constitutionally infirm. His decision to conduct only a minimal investigation was a reasonable exercise of professional judgment in light of the circumstances and given this Court's deferential standard of review. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 690. It is undisputed that Miles received voluminous discovery that included business records documenting the charges that Wilkins incurred and witness statements identifying Wilkins as the perpetrator. Further, it is undisputed that Wilkins had a history of similar crimes. Miles reviewed this evidence and discussed it with Wilkins, who ultimately conceded that he essentially committed these crimes. Wilkins may have at times denied committing all of the acts, or incurring the full loss amounts, but according to Miles, Wilkins' story was constantly shifting and his objections were vague. Based on this, it was reasonable for Miles to conclude that further investigation into each specific victim and loss amount was not necessary. Miles' "less-than-thorough pre-trial

investigation" appears to have been "supported by 'reasonable professional judgments.'" Mohammed, 693 F.3d at 203 (quoting Strickland, 466 U.S. at 691).

Miles' performance was not perfect. He could have done a more thorough investigation into the charges from Hotel Aloft for the night that Wilkins was incarcerated. For example, if Miles believed at the time that Wilkins' one-night stay in the Norfolk County jail did not overlap at all with the Hotel Aloft charges, that was simply wrong. If Miles learned that Wilkins was incarcerated for only one of the five nights, he should have investigated why the hotel still charged Wilkins for a night when he did not stay there, although the explanation could be that Wilkins had booked the room for that night and did not cancel or check out. Hence, while Miles' conduct on a few specific issues fell short of best practices, it was far from falling "below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Thus, Wilkins' ineffective assistance of counsel claim must fail with respect to Miles' performance during the plea agreement stage of the proceedings on most points.

The one issue where Miles' performance was deficient was regarding the statute of limitations. Wilkins asserts that Miles performed ineffectively by failing to consider whether the acts in the Statement of Offense were barred by the statute of limitations. He argues that because many of the acts occurred more than five years before he signed the plea agreement, the government could not have convicted him based on those acts. Therefore, he believes, Miles performed ineffectively by advising him to plead guilty to them. The government, on the other hand, argues that Wilkins could have been tried on all of those acts through the conspiracy count in the indictment, and therefore Miles was not ineffective.

Wilkins pleaded guilty to wire fraud, 18 U.S.C. § 1343, and aiding and abetting, 18 U.S.C. § 2. The statute of limitations for wire fraud (whether as a principal or through aiding and abetting

liability) is five years. See 18 U.S.C. § 3282(a). The indictment was filed on September 17, 2013. See Indictment at 1. Therefore any event occurring prior to September 17, 2008 is arguably time-barred, at least for the crimes of wire fraud and aiding and abetting.[2] Of the $106,668.29 loss amount that Wilkins agreed to, roughly half of it—$53,551.38—occurred before September 17, 2008. See Statement of Offense at 6–8.

The government argues that the statute of limitations is irrelevant because Wilkins could have been charged with all of the conduct through conspiracy liability. True, in a conspiracy the offense continues from the first agreement and overt act through the "termination of the conspiracy or, as to a particular defendant, until that defendant's withdrawal." Smith v. United States, 133 S. Ct. 714, 721 (2013). Thus, if all of the conduct in the Statement of Offense is a single conspiracy, then because some of the acts occurred within the five-year limitations period, Wilkins could be tried (and convicted) for all of the acts. See id. But Wilkins did not plead guilty to any conspiracy charge. Although the original indictment included one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349 (conspiracy) and § 1343 (wire fraud), the plea did not. See Indictment at 1–17; Plea Agreement at 2.

Miles, by his own testimony, did not discuss with Wilkins whether any of the conduct to which he pleaded guilty was outside of the statute of limitations. See Tr. 403:22–404:2. It is unclear from Miles testimony whether he was even aware that some of the acts in the Statement of Offense might be time-barred. See Tr. 403:10–14; 403:22–24. Although Miles was aware that some of conduct occurred more than five years before the guilty plea, it is not clear whether he

---

[2] Wilkins argues that the relevant date for calculating the limitations period is when he signed the Statement of Offense on June 20, 2014 (rather than when the indictment was issued), and thus all conduct that occurred before June 20, 2009, is time-barred. But generally a statute of limitations is tolled once the indictment is issued. See United States v. McMillan, 600 F.3d 434, 444 (5th Cir. 2010); United States v. Milstein, 401 F.3d 53, 67 (2d Cir. 2005). Wilkins presents no argument as to why the indictment would not toll the statute of limitations in this case.

knew that they occurred more than five years before the indictment (which would put them outside of the limitations period). See id. Had Miles considered this issue and conducted research and determined that the statute of limitations was not a viable defense—either because the same conduct could be charged through conspiracy liability or for some other reason—there would be no deficient performance. See Strickland, 466 U.S. at 690–91. Or had he relied on his professional judgment to determine that the plea deal was in Wilkins' interest regardless of the strength of any statute of limitations defense, then there likewise would be no deficient performance. See id. But while an attorney's "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable," a decision is not strategic at all when an attorney is simply unaware of relevant law and therefore did not exercise "reasonable professional judgment[]" in deciding not to investigate further. Id. Here, because the Court cannot find any evidence that Miles exercised professional judgment at all regarding whether the statute of limitations presented a viable defense, or whether it was in Wilkins' interest to accept this plea deal anyway, the Court cannot defer to Miles' judgment. Instead, the Court finds that Miles' performance—in failing to identify, research, and consider a possible affirmative defense to approximately half of the conduct that his client pleaded guilty to—was objectively unreasonable.

However, Wilkins suffered no prejudice as a result of Miles' performance. There is ample evidence indicating that there is no "reasonable probability that, but for counsel's errors, [Wilkins] would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. A defendant may waive a statute of limitations defense, and thus nothing prevents a defendant from pleading guilty to acts that would otherwise be time barred. See United States v. Wilson, 26 F.3d 142, 155 (D.C. Cir. 1994) (statute of limitations is waivable). Even if Miles was not aware of this possible defense, he was aware that the Statement of Offense dramatically expanded the offense

conduct beyond the indictment.  See Tr. 404:6–11.  He testified that he considered this, and explained to Wilkins why he still believed "despite that, that it was in [Wilkins'] best interest to plead guilty."  Tr. 404:6–11; see also Tr. 404:12–22.  Wilkins' later attorney, Mark Carroll, also testified that he believed it was a good plea deal given the government's evidence—further indicating that any reasonable attorney would have advised Wilkins to accept the plea.  See Tr. 453:24–454:1; 454:7–9.

Moreover, in determining whether there is a reasonable probability that the defendant would have gone to trial, a court considers "not only the count to which the defendant pled guilty, but also the other counts he would have faced had he gone to trial."  In re Sealed Case, 488 F.3d at 1017.  At trial, Wilkins would have faced one count of conspiracy to commit wire fraud.  The government presumably would have presented evidence of all his conduct as part of the charged conspiracy.  In this proceeding, in the context of sentencing, Wilkins contends that all of his conduct was part of one scheme.  See infra at 26–27.  While that might help his argument regarding sentencing—he asserts that because all of his conduct was one continuous scheme, a prior state court conviction should not count toward his criminal history score—it hurts his argument here.  If all of his conduct is one scheme, then it is likely all part of the same conspiracy, and thus not barred by the statute of limitations.  Given that Wilkins himself inadvertently makes a reasonable argument that his conduct is all part of the same conspiracy, it seems likely any reasonable attorney considering the statute of limitations issue still would have advised Wilkins that it would not be a strong defense.  Thus, Wilkins has not demonstrated that there is a reasonable probability that but for Miles' deficient performance on this issue, he would have gone to trial.  Hence, Wilkins suffered no prejudice, and cannot obtain relief on this theory.

## II.    After The Guilty Plea And Before The Sentencing

Wilkins claims that he asked both of his attorneys—Miles and later Carroll—to withdraw his guilty plea prior to sentencing.  He argues that their failure to do so constitutes ineffective assistance of counsel.  See Def.'s Pre-Hr'g Br. at 5; Def.'s Pre-Hr'g Reply Br. [ECF No. 107] at 2.  But the evidence demonstrates that neither Miles nor Carroll performed deficiently at this stage.

Neither party has provided the Court with any cases regarding whether and when an attorney's failure to move to withdraw a guilty plea is deficient performance under Strickland.  But the standard for prejudice in this context is clear: Wilkins "must show a reasonable probability that, 'but for counsel's unprofessional errors,' Strickland, 466 U.S. at 694, he would have sought to withdraw his plea and the court would have permitted him to do so."  United States v. Newman, 805 F.3d 1143, 1147 (D.C. Cir. 2015).  Prior to sentencing, a court may permit a defendant to withdraw a guilty plea if there is "fair and just reason" to do so.  See Fed. R. Crim. P. 11(d)(2)(B); Newman, 805 F.3d at 1147.[3]  "Withdrawal of a guilty plea prior to sentencing is to be liberally granted," United States v. Taylor, 139 F.3d 924, 929 (D.C. Cir. 1998), but is ultimately left to the district court's discretion, United States v. Curry, 494 F.2d 1124, 1128 (D.C. Cir. 2007).  Moreover, Wilkins must also "demonstrate a reasonable probability that after withdrawing his plea he would either have insisted on going to trial, see Hill, 474 U.S. at 59, or obtained a [more favorable] plea deal . . . , see Missouri v. Frye, 132 S. Ct. 1399, 1409 (2012)."  Newman, 805 F.3d at 1147.

### A.  Miles' Performance

---

[3] Under Rule 11, a defendant may not withdraw a guilty plea after sentencing except on direct appeal or collateral review.  See Fed. R. Crim. P. 11(e).  The government argues that because Wilkins raises this issue on collateral attack—which is necessarily after sentencing—the Court should use the stricter post-sentencing standard to evaluate the petition at hand.  This argument does not make sense, and does not comport with the law.  The question before the Court is whether Wilkins would have sought to withdraw his plea if he had the benefit of effective counsel, and whether the Court would have accepted that withdrawal based on the standard applicable at the time he made the motion, i.e., the "fair and just reason" standard.  See Newman, 805 F.3d at 1147–48.

Miles testified that shortly after Wilkins pleaded guilty, Wilkins began questioning the loss amount in the Statement of Offense. Tr. 378:14–24. According to Miles, there were several weeks where Wilkins expressed dissatisfaction with the plea and would suggest that he try to withdraw the plea, but then would change his mind. Tr. 378:22–379:11. Eventually, Wilkins became serious about his desire to withdraw his guilty plea based on Wilkins' view that Miles did not advise him properly about the plea agreement. Tr. 378:11–16. At that time, Miles decided that he needed to withdraw as Wilkins' attorney, rather than advise Wilkins on whether or not Miles himself had been ineffective, and the legal implications of any alleged ineffective assistance. Tr. 379:12–25. Indeed, to provide such advice, Miles thought, would be a conflict of interest. Tr. 379:21–25; see also Def.'s Ex. 19 (June 9, 2015 email from Miles to Wilkins stating "I believe you have raised issues and concerns . . . that create a conflict of interest for me to continue to represent you").

Miles' decision to withdraw as Wilkins' counsel, rather than advise Wilkins on whether or not to move to withdraw his plea, did not "f[a]ll below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Wilkins has provided no support for the legal argument that Miles had an obligation to file a motion to allow Wilkins to withdraw his plea, rather than withdraw as Wilkins attorney and let new counsel move to withdraw the plea. Indeed, it would be surprising if there were any support for that proposition. Miles' actions were consistent with the recommended standards in the American Bar Association's guidelines for criminal defense attorneys. See ABA Criminal Justice Standards for the Defense Function, Standard 4-8.1 (4th Ed. 2015) ("if a post-trial motion is based on ineffective assistance of counsel, defense counsel should seek to withdraw"). Courts often use such guidelines as an indication of prevailing professional norms. See, e.g., United States v. Bruce, 89 F.3d 886, 894 (D.C. Cir. 1996) (relying on ABA Model Rules of Professional Conduct); United States v. Morrison, 98 F.3d 619, 626 n.8 (D.C. Cir.

1996) (same).  Thus, Wilkins has not demonstrated that Miles' performance was ineffective.

**B.  <u>Carroll's Performance</u>**

Wilkins faces a fundamental hurdle in advancing his argument that Carroll performed deficiently by failing to move to withdraw Wilkins' guilty plea:  Carroll testified that Wilkins never asked him to do so.  Tr. 454:5, 460:6–9.  Carroll stated that Wilkins was displeased with the loss amount in the plea agreement, and more generally was angry with the predicament he was in, but never asked Carroll to seek to withdraw his plea.  Tr. 454:5–7.

Wilkins, on the other hand, testified that he did ask Carroll to withdraw his guilty plea.  Tr. 108:17–18, 24–25.  According to Wilkins, this request was relayed in a text message.  Tr. 109:12–13.  Wilkins believes he may also have conveyed his request in person or on the phone; it is not clear from Wilkins' testimony whether the alleged text message was the only time prior to sentencing that he asked that Carroll withdraw his guilty plea, or whether the text message was following up on an earlier conversation.  Tr. 108:21–110:4.  No text message was introduced into evidence.  Wilkins testified that he was not able to retrieve a copy of the text message from his own phone, and Carroll testified that he does not save text messages.  Tr. 108:6–16 (Wilkins), 472:18–22 (Carroll); Def.'s Ex. 20 (email from Carroll stating that he did not save any text messages).

For the reasons described more thoroughly above, the Court does not find Wilkins credible on this point either, and instead accepts Carroll's testimony that Wilkins did not ask him to withdraw the plea.  Wilkins' own description of asking Carroll to withdraw the plea is garbled and at times nonsensical.  <u>See</u> Tr. 108:17–110:4.  And while it is certainly possible that a text message from 2015 has since been lost (and the Court therefore reads little into the fact that the text message could not be produced), it seems unlikely that Wilkins would have raised the issue once in a text

message then never followed up on it with Carroll, if indeed he wanted his plea withdrawn. On the whole, the Court is not persuaded that Wilkins actually asked Carroll to move to withdraw his guilty plea. Thus, the ineffective assistance claim on this theory also fails.

### III.     Sentencing

Finally, Wilkins argues that Carroll provided ineffective representation at sentencing because he failed to raise a host of potentially beneficial arguments. Under the performance prong of <u>Strickland</u>, "[w]here sentencing benefits are available under existing law, this court has concluded that counsel is ineffective when he fails to advocate on his client's behalf at sentencing." <u>United States v. Abney</u>, 812 F.3d 1079, 1089–90 (D.C. Cir. 2016) (citing <u>United States v. Rodriguez</u>, 676 F.3d 183, 191 (D.C. Cir. 2012); <u>United States v. Soto</u>, 132 F.3d 56, 59 (D.C. Cir. 1997)). "Whether counsel's representation is deficient due to misinterpretation of the Sentencing Guidelines or failure to invoke a salient Guidelines provision," such errors "clearly satisfy" the performance prong of <u>Strickland</u>. <u>Id.</u> at 1089; <u>see also</u> <u>United States v. Gaviria</u>, 116 F.3d 1498, 1512 (D.C. Cir. 1997). However, as at other stages of a proceeding, a "strategic choice" not to raise an argument at sentencing, if "made after thorough investigation of the law and facts . . . [is] virtually unchallengeable." <u>See</u> <u>Strickland</u>, 466 U.S. at 690; <u>United States v. Headley</u>, 923 F.2d 1079, 1084 (3d Cir. 1991) (counsel was ineffective for failing to argue for minimal-role adjustment because "[t]here is no rational basis to believe" that counsel's failure to raise it "was a strategic choice").

In evaluating prejudice at sentencing, if "[t]here is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" then a petitioner has demonstrated prejudice. <u>Soto</u>, 132 F.3d at 59 (quoting <u>Strickland</u>, 466 U.S. at 694). In other words, at the sentencing stage both the performance prong and the prejudice prong depend

on whether there were valid arguments for a lower sentence that Carroll could have raised but did not.

Wilkins identifies several arguments that he believes Carroll should have raised. However, the Court again finds that Carroll's performance was not deficient. Some of Wilkins' claims are points Carroll could not properly raise given the plea agreement; some are arguments that Carroll did raise even if Wilkins is now unsatisfied with how aggressively Carroll pushed them; and some are arguments that were not raised—or were raised in a particular manner—as a strategic choice, which does not constitute ineffective assistance of counsel. The Court will deal with most of these briefly, and then discuss Wilkins' arguments related to his Henrico County conviction in more depth.

Two of Wilkins' arguments must fail because they contradict his plea agreement. Wilkins maintains that Carroll should have challenged the loss amounts used to calculate the guidelines range because some of the incidents occurred outside of the five-year statute of limitations. But Wilkins agreed to those loss amounts and to the guidelines range calculation in his Statement of Offense and plea agreement. See Plea Agreement at 2. He signed both documents, thereby agreeing to their contents, and then confirmed his adoption of the loss amount and resulting guidelines range during questioning by the Court in the plea colloquy. See Plea Hr'g Tr. 18:13–22. Moreover, Wilkins expressly waived any statute of limitations argument. Plea Agreement at 7. Carroll could not have raised those arguments at the sentencing hearing without also asking the Court to allow Wilkins to withdraw his plea.

Likewise, Wilkins' criminal history score included two points added under U.S.S.G. § 4A1.1(d) for committing the instant offense while under a criminal justice sentence for his prior conviction in Henrico County. Without those two points, his criminal history score would have

been a category IV, rather than a category V, which would have led to a lower guidelines range. His sentence for the Henrico County offense was imposed on May 18, 2010. Wilkins now argues that Carroll should have objected to these two points because the offense conduct described in the indictment ends in April 2010, and therefore does not overlap with Wilkins' prior Henrico County sentence. But once again, Wilkins forgets that he is bound by his plea agreement. The offense conduct as described in the Statement of Offense (rather than the indictment) lasts through September 2013, which does overlap with the sentence Wilkins received from his Henrico County conviction. Thus, Carroll did not err when he failed to raise this argument.

Wilkins also argues that Carroll should have brought several mitigating factors to the Court's attention to argue for a downward departure from the guidelines range, including his difficult childhood, history of sexual assault in prison, and time served on a similar offense in Henrico County. Wilkins is correct that his plea agreement did not prevent Carroll from asking for a below-guidelines sentence, see id. at 4, and that a court may consider all these factors when determining the sentence, see 18 U.S.C. § 3553(a)(1) (requiring consideration of the defendant's "history and characteristics"); id. § 3553(b) (allowing consideration of "mitigating circumstance . . . not adequately taken into consideration" by the guidelines); United States v. Thomas, 114 F.3d 228, 268–69 (D.C. Cir. 1997) (affirming consideration of negative influence in childhood as mitigating factor); United States v. Graham, 83 F.3d 1466, 1481 (D.C. Cir. 1996) ("extreme vulnerability to assault in prison may be a ground for departure").

But Carroll did identify these characteristics in his sentencing memorandum as justifications for a sentence at the low end of the guidelines, even if he did not explicitly ask for a below-guidelines sentence. See Def.'s Sentencing Mem. [ECF No. 37-2] at 2, 6–7. Carroll also did, briefly, request a below-guidelines sentence during the hearing itself. See Sentencing Tr.

[ECF No. 61] at 13:10–12. The Court discussed some of these characteristics during the sentencing hearing, and explicitly acknowledged the defendant's request for a below-guidelines sentence. See Sentencing Tr. at 18:4–9, 17–19; 19:8–9. Thus, the gravamen of Wilkins' argument is that Carroll should have been more persuasive, not that there were valid arguments Carroll could have raised but did not. Indeed, Carroll testified at the evidentiary hearing that his decision to explicitly request a below-guidelines sentence in person at the hearing, rather than in the written sentencing memorandum, was a strategic choice because he thought a "soft" ask was likely to be more persuasive to the sentencing court than a more aggressive one. See Tr. 478:9–8; 478:24–479:4. Carroll's decision of when and how to raise these arguments is the type of strategic choice that does not support an ineffective assistance of counsel claim. Carroll did not act unreasonably by raising these arguments in the manner that he did, based on his judgment and experience at the time, rather than in the manner that Wilkins now wishes he had.

Wilkins raises several additional arguments related to his Henrico County conviction. In April 2010, he was convicted in Henrico County for a fraudulent scheme similar to the one here. See Presentence Investigation Report (PSR) [ECF No. 30] ¶ 61. In May 2010, he was sentenced to three years' imprisonment and six months' probation, and he was released from custody and began his term of probation in November 2012. Id. Wilkins contends that Carroll should have argued that the time Wilkins served on that offense warranted a lower sentence here based on §§ 5G1.3 and 5K2.23 of the guidelines. Wilkins also argues that the Henrico County conviction is "relevant conduct" under § 1B1.3, and therefore should not have counted toward his criminal history score. See U.S.S.G. § 4A1.2(a) & n.1 (past conviction is not a "prior sentence" for purpose of criminal history calculation if it is "relevant conduct" under § 1B1.3).

An offense is "relevant conduct" under the guidelines if it is part of a "common scheme or

plan" or "same course of conduct." Id. § 1B1.3 n.9(B). "[T]wo or more offenses" may "constitute part of a common scheme or plan" if they are "substantially connected . . . by at least one common factor" such as a similar "modus operandi." Id. § 1B1.3 n.9(B)(i). Or, offenses that are not part of a common scheme may be part of the "same course of conduct" if they are "sufficiently connected or related . . . as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. § 1B1.3 n.9(B)(ii). Factors to consider are "the degree of similarity," the "regularity," and "the time interval between the offenses." Id.

The acts underlying the Henrico County offense used a similar modus operandi: Wilkins and an accomplice fraudulently purchased airline tickets using a similar "charge back" scheme. See PSR ¶ 61. That offense occurred in February 2009. According to the Statement of Offense, his acts in the instant offense took place from 2007 through 2013. Thus, Wilkins now argues that the Henrico County offense was part of a "common scheme or plan" or the "same course of conduct" as the acts charged in federal court.

Section 5G1.3 requires, as relevant here, that the term of imprisonment from the instant offense be imposed concurrently with any undischarged term of imprisonment for another conviction based on "relevant conduct." Section 5K2.23 states that "a downward departure may be appropriate" when there is no undischarged term of imprisonment from a prior sentence for "relevant conduct," but where if there were an undischarged term of imprisonment then § 5G1.3 would apply. In other words, it provides a mechanism for a court to account for time served from a conviction for "relevant conduct," even if that term of imprisonment has been served in full.

Carroll explained that he considered these three arguments, but ultimately rejected them. According to Carroll's testimony, his research consisted primarily of consulting with the probation officer who prepared the presentence investigative report. Carroll testified that he called the

probation officer and "went over the guidelines together on the phone. And she pointed out how, because of the timing of the sentencing, that he would not get the benefit of it being a concurrent case, and also because of the timing of it, that it would count towards his criminal history points." Tr. 482:7–12. According to Carroll, "she walked [him] through the supportive notes that are at the end of each guidelines, and [he] concluded that [Wilkins] was not going to get the benefit" of either the "relevant conduct" determination under § 1B1.3 or the concurrent sentence provision under § 5G1.3. Tr. 482:13–18. Carroll further testified that although he determined § 5K2.23 could technically apply, in his judgment he believed that using that section as the basis to ask for a below-guidelines sentence could be seen as asking for too much, and would ultimately "hurt [Wilkins'] position" and "would not have helped Mr. Wilkins." Tr. 483:20–22, 484:4.

Carroll is correct that Wilkins could not benefit from § 5G1.3, and therefore he acted reasonably in not raising it. That section only applies to defendants who have a remaining undischarged term of imprisonment from a previous conviction—here, Wilkins had already completed his term of imprisonment for the Henrico County offense.

Whether Wilkins could have benefitted from § 1B1.3 or § 5K2.23 is a closer call. However, whether a prior offense is "relevant conduct" under § 1B1.3 is a judgment call, unlike some other provisions of the sentencing guidelines that are more cut and dry. Cf. United States v. Cox, 851 F.3d 113, 121 (1st Cir. 2017) ("A district court's finding on the scope of a particular scheme" for the purpose of determining relevant conduct under § 1B1.3 "represents a practical, real-world assessment of probabilities, based on the totality of the proven circumstances" (internal quotation marks omitted)). Here, Carroll conducted research into the question by reading the guidelines and their commentary and discussing the matter with the probation office, and then, based on his judgment and experience, he determined that the Henrico County offense did not fit within the

definition of "relevant conduct" as defined by § 1B1.3.  And if the Henrico County offense was not relevant conduct, then § 5K2.23 could not apply to support a downward departure.  A different attorney could have reasonably reached a different decision, but the Court cannot say that this judgment was objectively unreasonable, or was a "misinterpretation of the Sentencing Guidelines or failure to invoke a salient Guidelines provision."  See Abney, 812 F.3d at 1089–90.

Moreover, Carroll made the strategic choice that although he could argue for a below-guidelines sentence based on § 5K2.23 even though it might not technically apply, it would not be in his client's interest to do so.  This is the sort of judgment call that attorneys are expected to make at a sentencing hearing, and which therefore are not appropriate for second-guessing through a collateral attack.  True, Carroll could have taken a different, more aggressive, approach at sentencing, which may or may not have benefitted Wilkins.  But his failure to do so does not indicate that his performance was unreasonable under Strickland and Abney.  Wilkins has therefore failed to show that Carroll provided ineffective assistance of counsel at sentencing.

## CONCLUSION

Although Wilkins has identified some areas where his attorneys could have been more diligent, none of the issues that Wilkins presents rise to the level of deficient performance constituting ineffective assistance of counsel.  Hence, Wilkins' petition for relief under 28 U.S.C. § 2255 will be denied.  A separate Order will issue on this date.


_____
/s/
JOHN D. BATES
United States District Judge

Dated:  June 6, 2017